Nos. 101,958
101,959

STATE OF KANSAS, *Appellant*, v. MARCY FAITH CARAPEZZA, *Appellee*. and STATE OF KANSAS, *Appellant*, v. JASON COLE HUGHES, *Appellee*.

(272 P.3d 10)

 Opinion filed
March 9, 2012. 

*Rodney H. Symmonds,* of Symmonds & Symmonds, LLC, of Emporia, special prosecutor, argued the cause, and *Steve Six,* attorney general, was with him on the brief for appellant.

*Julia S. Spainhour,* of Northeast Kansas Conflict Office, argued the cause and was on the brief for appellee Carapezza.

*Stephen J. Atherton,* of Atherton & Huth, of Emporia, argued the cause and was on the brief for appellee Hughes.

The opinion of the court was delivered by

JOHNSON, J.: Marcy Faith Carapezza and Jason Cole Hughes (collectively referred to as defendants) were convicted of felony murder and other felonies. Following decisions by this court remanding the cases for new trials, the district court suppressed certain evidence as being derived from the defendants' immunized inquisition testimony. The State of Kansas takes interlocutory appeals from the district court's suppression orders, contending that the district court applied an incorrect burden of proof and that the State did not make an improper use of the immunized statements. We affirm the district court's rulings.

## FACTUAL AND PROCEDURAL OVERVIEW

Detailed statements of facts are contained in the two opinions which reversed the defendants' convictions: *State v. Carapezza,* 286 Kan. 992, 191 P.3d 256 (2008) (*Carapezza I*), and *State v. Hughes,* 286 Kan. 1010, 191 P.3d 268 (2008) (*Hughes I*). Accordingly, we will provide a highly summarized overview.

Molly Paico worked part-time for Mary Clark. On May 5, 2004, Clark was found dead in her home in Emporia, the apparent victim

of blunt-force trauma to her head. Paico soon became a prime suspect in the killing, due to evidence found at Clark's house and Paico's use of Clark's bank debit card and the cashing of Clark's forged checks. Paico was arrested in Wichita 2 days later on burglary, theft, and forgery charges. Paico implicated Raven Briney and perhaps Hughes in the killing. She also discussed Carapezza and Hughes with the officers in the context of their drug use.

The police interviewed Carapezza and Hughes several times, seeking information on Paico. The two consistently denied any involvement in the attack on Clark. Eventually, both testified at inquisitions; Hughes on July 15, 2004, and Carapezza on July 21, 2004. Prior to their inquisitions, the county attorney granted Carapezza and Hughes use and derivative use immunity, thereby effectively compelling them to testify.

The morning of Carapezza's inquisition, the State charged Paico with first-degree murder in Clark's killing. Paico then initiated plea negotiations in which she offered to testify against and implicate Carapezza and Hughes, contrary to her earlier version of events. Paico participated in a series of immunized inquisitions and eventually entered a guilty plea to one count of aggravated burglary and three counts of aiding a felon, receiving a 60-month sentence for her part in the murder.

Paico's plea agreement story had her going to Clark's home to repay the money she had taken. Looking into a window, she saw Carapezza, Hughes, and a third person named Gail Bennett. Upon entering the house, Paico saw Hughes holding a hammer and blood on Clark's head. Paico further testified that she subsequently personally participated in the crime by hitting Clark on the head several times with the hammer and sticking a glove in her mouth in order to keep her quiet.

Immediately following the inquisitions, the police broadened their investigation and conducted additional interviews and inquisitions. About a month after her immunized inquisition testimony, on August 27, 2004, Carapezza was charged with murder in Clark's death. Some months later, on December 13, 2004, the State charged Hughes. Ultimately, they were both convicted of felony murder, together with other felonies.

On appeal, this court, in a split decision, reversed the convictions because of improper expert testimony regarding the propensity of drug users to commit violent crimes. Given that disposition, the majority declined to examine the entire record for the purpose of determining which items of the State's evidence were the product of immunized testimony. But the opinions directed the trial court to conduct renewed hearings on that issue and placed the burden on the State "to demonstrate that no part of its case was or will be derived from the immunized testimony." *Carapezza*, 286 Kan. at 1007; *Hughes*, 286 Kan. at 1029.

Carapezza and Hughes filed renewed motions to suppress evidence pursuant to *Kastigar's* prohibition against the State's use of immunized testimony. The trial court granted the defendants' motions to suppress in part.

First, the district court precluded the county attorney, his assistants, and his staff from participating in any new trial in any way, including refraining from any discussions or information-sharing with any substitute or special prosecutor. Next, the court employed the methodology excluding the testimony of any State witness who had been present at the defendants' immunized inquisitions, as well as those that had been exposed to the immunized statements, which included seven specifically named law enforcement officers. Finally, the court discussed in detail the reasons for excluding the testimony of seven lay witnesses, which included Paico.

However, the district court carefully explained that it had found that a number of witnesses had not been exposed to the immunized statements; that they would be testifying solely from their own knowledge; and that they would be testifying about information that had been gathered from them prior to the time of defendants' immunized statements. The court then specifically named the 38 persons whose entire testimony could be used in a retrial.

Subsequently, the district court granted the defendants' motion to reconsider and suppressed the testimony of one additional witness. The court denied the State's motion for reconsideration. The State then filed a notice of interlocutory appeal under K.S.A. 22-3603, challenging the district court's suppression of evidence. Because the defendants have not cross-appealed, we do not consider

the district court's findings that the State met its burden to prove that the testimony of the 38 specifically named witnesses constituted evidence independently obtained from a collateral source.

## STATE'S BURDEN OF PROOF

The State's brief, after a 45-page factual recitation, begins its legal arguments by first complaining that the district court misinterpreted the provisions of K.S.A. 22-3102(b)(2) when it required the State to meet a clear and convincing burden of proof. The State believes that, when the issue before the court involves the indirect or nonevidentiary use of immunized testimony, the appropriate standard is the preponderance of the evidence burden of proof purportedly utilized in *Kastigar v. United States*, 406 U.S. 441, 461-62, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972).

### Standard of Review

Statutory interpretation is a question of law. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). More specifically, a determination of the applicable burden of proof is a question of law. *In re Estate of Farr*, 274 Kan. 51, 62, 49 P.3d 415 (2002). An appellate court has unlimited review over conclusions of law. *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915, 157 P.3d 1109 (2007).

### Analysis

Immunity statutes "seek a rational accommodation between the imperatives of the privilege [against self-incrimination] and the legitimate demands of government to compel citizens to testify." *Kastigar*, 406 U.S. at 446. Kansas has a statute specifically dealing with the privilege against self-incrimination and grants of immunity in the context of inquisitions in criminal cases, *i.e.*, K.S.A. 22-3102.

The statute begins by declaring that "[n]o person called as a witness at an inquisition shall be required to make any statement which will incriminate such person." K.S.A. 22-3102(a). It then authorizes a county or district attorney to grant in writing to any person either transactional immunity or use and derivative use immunity. K.S.A. 22-3102(b). A person receiving a grant of immunity cannot refuse to testify on the grounds of self-incrimination unless an unimmunized violation of federal law is implicated. K.S.A. 22-

3102(c). We are interested here in the specific provisions governing a grant of use and derivative use immunity, set forth in K.S.A. 22-3102(b)(2), which provides:

"Any person granted use and derivative use immunity may be prosecuted for any crime, but the state shall not use any testimony against such person provided under a grant of such immunity or any evidence derived from such testimony. Any defendant may file with the court a motion to suppress in writing to prevent the state from using evidence on the grounds that the evidence was derived from and obtained against the defendant as a result of testimony or statements made under such grant of immunity. The motion shall state facts supporting the allegations. Upon a hearing on such motion, *the state shall have the burden to prove by clear and convincing evidence that the evidence was obtained independently and from a collateral source.*" (Emphasis added.)

In the landmark case of *Kastigar*, the United States Supreme Court ruled that "[o]ne raising a claim under [the federal immunity] statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." 406 U.S. at 461-62. Many courts have determined that the "heavy burden" to which *Kastigar* referred is satisfied when the State is able to demonstrate that a preponderance of the evidence supports its position. The adjective "heavy," as used in *Kastigar* to describe the prosecution's burden of disproving use or derivative use, "refers to the difficulty of proving a negative, not the standard of proof." *Aiken v. United States*, 956 A.2d 33, 45 n.39 (D.C. 2008). The government is only required "to demonstrate by a preponderance of the evidence an independent source for all evidence introduced." *United States v. Seiffert*, 501 F.2d 974, 982 (5th Cir. 1974), cited with approval in *United States v. Gregory*, 730 F.2d 692, 698 (11th Cir. 1984), *cert. denied* 469 U.S. 1208 (1985). See, *e.g.*, *United States v. Schmidgall*, 25 F.3d 1523, 1528 (11th Cir. 1994); *United States v. Danielson*, 325 F.3d 1054, 1074 (9th Cir. 2003); *United States v. Daniels*, 281 F.3d 168, 180 (5th Cir. 2002); *United States v. Nanni*, 59 F.3d 1425, 1431-32 (2nd Cir. 1995); *United States v. Bartel*, 19 F.3d 1105, 1112 (6th Cir. 1994); *People v. Stevenson*, 228 P.3d 161, 165-68

(Col. App. 2009); *State v. Vallejos*, 118 N.M. 572, 577, 883 P.2d 1269 (1994).

The district court acknowledged that some courts applying *Kastigar* have used a preponderance of the evidence test to protect a defendant's Fifth Amendment rights. However, the trial court correctly noted that Kansas is free to charge the State with a burden of proof that provides greater protection for an individual's rights than is minimally required by the Fifth Amendment. In other words, the United States Constitution sets forth the minimum endowment of individual rights for which the states have no power to violate. But it does not limit a state's power to invest its citizens with more, or greater, rights than the federal constitution's minimum guarantees. The district court found in the explicit language of K.S.A. 22-3102(b)(2) a legislative intent to provide that greater protection.

In its brief to this court, the State concedes the legal principle that a state constitution or state legislation may provide its state's citizens with greater rights than is required to be provided by the United States Constitution. Instead, it argues that the language in K.S.A. 22-3102(b)(2) purports to apply the clear and convincing burden only to direct uses of the immunized testimony. Accordingly, the argument continues, any indirect or nonevidentiary use of immunized testimony is to be governed by the preponderance of the evidence standard alleged to have been applied in *Kastigar*.

Unfortunately, the State does not flesh out its suggestion that a derivative use cannot encompass an indirect or nonevidentiary use, and the logic of such an assertion is not readily apparent. Nevertheless, we need not endeavor to parse the State's cursory argument on burden of proof. In ruling on the motion for reconsideration, the trial court opined that the State had failed to sustain its burden of proof under either standard, specifically stating:

"And simply put here, no matter which burden of proof we deal with, the State has not convinced me that there was a sufficient enough segregation that the carryover from who was involved in Ms. Carapezza's and Mr. Hughes' inquisitions did not somehow permeate this entire case."

Accordingly, we take our cue from *United States v. Siewert*, 2008 WL 4635258, at *6 (D. Minn. 2008) (unpublished opinion), which held:

"The standard of review to be applied in a *Kastigar* hearing has not been firmly established in this circuit. The government urges the Court to adopt a preponderance of the evidence standard while the Defendant urges the Court to adopt the clear and convincing standard of proof. The Court ultimately finds, however, that it is unnecessary to determine the standard of proof to be applied in *Kastigar* hearings because, under either standard, the government has failed to meet its burden here."

The level of the State's burden of proof did not make a difference in the district court's ruling. Likewise, our review will not be impacted by the academic question of which burden of proof is applicable to an "indirect" derivative use of immunized testimony, if there is such a subset. Accordingly, we move on to the merits of the appeal.

### DERIVATIVE USE OF IMMUNIZED TESTIMONY

The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any Criminal Case to be a witness against himself." That Fifth Amendment " 'protects an accused . . . from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature.' " *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) (quoting *Schmerber v. California*, 384 U.S. 757, 761, 86 S. Ct. 1826, 16 L. Ed. 2d 908 [1966]).

In a more gender-neutral statement, the United States Supreme Court has explained that the Fifth Amendment does not preclude the government from compelling a witness to testify, so long as the witness is immunized.

"It is well established that the government may compel witnesses to testify at trial or before a grand jury, on pain of contempt, so long as the witness is not the target of the criminal case in which he testifies. [Citations omitted.] Even for persons who have a legitimate fear that their statements may subject them to criminal prosecution, we have long permitted the compulsion of incriminating testimony so long as those statements (or evidence derived from those statements) cannot be used against the speaker in any criminal case. [Citations omitted.]" *Chavez v. Martinez*, 538 U.S. 760, 767-68,123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003).

In order to pass constitutional muster, compelled testimony may not be used for gaining knowledge of the details of a crime and

cannot be the source of information which may supply other means of convicting the witness. Likewise, the compelled testimony may not be used to search out other testimony to be used as evidence against the witness. See *Kastigar*, 406 U.S. at 454.

In her direct appeal from the first trial, Carapezza argued that the State violated her Fifth Amendment right against self-incrimination when it used her compelled inquisition testimony to further its investigation of Clark's murder, to prepare for trial, and to plan trial strategy, all in violation of the State's grant of use and derivative use immunity. *Carapezza I*, 286 Kan. at 1006. Likewise, Hughes claimed the same constitutional violation based on the State's derivative use of his immunized inquisition testimony. *Hughes I*, 286 Kan. at 1028.

In both direct appeals, we held that, because we were reversing for new trials on other grounds, we would decline to resolve the constitutional question by reexamining the evidence presented at the State's first trial to determine whether it was the product of immunized testimony. Instead, we directed the district court "to conduct a renewed hearing or hearings with respect to the use of such testimony," at which "the burden will be on the State to demonstrate that no part of its case was or will be derived from the immunized testimony." *Carapezza*, 286 Kan. at 1007; *Hughes*, 286 Kan. at 1029. In that regard, we offered the following:

> "In conducting this hearing, the district court is to be mindful of certain principles. '[Use immunity] prohibits the prosecutorial authorities from using the compelled testimony in *any* respect.' *Kastigar*, 406 U.S. at 453. At the hearing, the State [government] must demonstrate that it obtained all of the evidence it proposes to use from sources independent of the compelled testimony. See [*United States v. North*, 910 F.2d 843, 854, (D.C. Cir. 1990)]. The district court must make specific findings on the independent nature of the proposed evidence. 910 F.2d at 855-56. No use at all may be made of the immunized testimony. 910 F.2d at 862. The fact that other witnesses were exposed to immunized testimony may suffice to taint their testimony. See 910 F.2d at 863-64." *Carapezza*, 286 Kan. at 1007; *Hughes*, 286 Kan. at 1029-30.

The district court dutifully conducted a hearing, which we will refer to as the "*Kastigar* hearing." The *Kastigar* hearing was extensive; defendants' attorneys and a special prosecutor for the State examined 61 witnesses. Following the comprehensive hearing, the

district court conscientiously applied the principles described in *Carapezza I* and *Hughes I* to the evidence presented at the hearing which the court found most credible and excluded the testimony of approximately 15 witnesses. The State would apparently have this court perform that procedure anew on appeal, utilizing the hearing transcript for our fact-finding. We decline that invitation.

*Standard of Review*

When these cases were here before, we stated a standard for reviewing a Fifth Amendment self-incrimination claim, notwithstanding our refusal to actually perform the review of that issue at that time. We stated:

"When asked to review the violation of a defendant's Fifth Amendment right against self-incrimination, this court reviews the district court's factual findings using a substantial competent evidence standard, but the ultimate legal conclusion is reviewed as a question of law using an unlimited standard of review. *State v. Bell*, 280 Kan. 358, 362, 121 P.3d 972 (2005)." *Carapezza I*, 286 Kan. at 1007; *Hughes I*, 286 Kan. at 1029.

Much of the analysis in this appeal focuses on the district court's determination that the State failed to meet its burden of proving that the excluded evidence was derived from a legitimate source wholly independent of the compelled testimony, *i.e.*, was not derived from the defendants' immunized statements. The finding that the State failed to meet its burden of proof is a negative factual finding. An appellate court will not disturb a negative finding "absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice. [Citation omitted.]" *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 928, 157 P.3d 1109 (2007). See also *City of Dodge City v. Norton*, 262 Kan. 199, 203, 936 P.2d 1356 (1997) (articulating negative finding standard in context of trial court finding that police lacked probable cause to arrest).

*Analysis*

First, the State complains about the district court's holding that the prosecutors and law enforcement officers who were exposed to the defendants' immunized statements must refrain from any further participation in these cases. The State contends that simply

being exposed to an immunized statement does not cause one to run afoul of the defendant's Fifth Amendment protections, but rather it is the *use* of the immunized testimony that creates the constitutional violation.

Apparently, the State chooses to ignore our specific holding in *Carapezza I* and *Hughes I* that "[t]he fact that other witnesses were exposed to immunized testimony may suffice to taint their testimony. [Citation omitted.]" 286 Kan. at 1007; 286 Kan. at 1030. The district court, however, took note of that holding and concluded "that neither the State's attorney or the law enforcement officers who were exposed to the defendants' statements could rationally be expected to avoid utilizing the defendants' statements, even if for nothing more than to confirm their belief that the defendants were lying about their involvement in Ms. Clark's death."

In addition, the district court reviewed cases from other jurisdictions, such as *State v. Munoz*, 103 N.M. 40, 702 P.2d 985 (1985), and *State v. Gault*, 551 N.W. 2d 719 (Minn. App. 1996), which dealt with a prosecutor's continued participation in a prosecution after being exposed to immunized testimony. The district court correctly noted that the development of trial strategy would clearly be a prohibited use of defendants' immunized statements. Likewise, the court opined that it was undeniable that "a prosecutor, having a statement made under oath by a defendant, even if an exculpatory statement, enjoys a significant strategic advantage in shaping the investigation and trial."

The court then looked at what transpired with Carapezza and Hughes and specifically found that "the prosecutors made no effort to insulate either themselves or the principal investigating officers from the statement of either defendant." Rather, the court found that "the prosecutors immersed them in those statements," and failed to utilize any of the recognized means to avoid the taint of the immunized statements. In other words, the district court found that the State had failed to prove that it had not made a derivative use of the defendants' immunized statements. That holding withstands scrutiny under either standard of review: It is supported by substantial competent evidence in the record, and there is no proof

of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice.

The State also argues that there were a number of detectives whose testimony was suppressed who did not play an active role in the investigation after the defendants provided their immunized statements. The suggestion is that evidence obtained prior to the defendants' inquisition testimony cannot be tainted by the immunized statements. Prior to making the holdings described above, the district court specifically addressed the State's temporal argument and found the holdings in *United States v. McDaniel*, 482 F.2d 305 (1973), to be persuasive, to-wit:

> "In similar factual circumstances where the prosecution claimed that all of the necessary reports and facts had been gathered prior to the prosecutor's exposure to the immunized statement, the Eight Circuit Court of Appeals in the *McDaniel* case pointed out that under *Kastigar* the question is not whether the testimony relates to the charges, but whether the prosecution has used the testimony. Thus, [*McDaniel*] found that even though the reports may have been acquired as a result of an independent source, this does not mean that the prosecution did not use the compelled statements in some significant way short of an actual attempt to introduce the evidence at trial. The Court of Appeals noted that such use could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy."

We agree with the district court's analysis. The State cannot meet its burden of proving that it did not make a derivative use of immunized testimony simply by pointing to a calendar. It must show that it did not develop a use for the prior-obtained evidence after compelling the defendant's testimony. For instance, if defendant's immunized statement causes a prosecutor to re-configure how he or she intends to use a prior statement, the State is making a derivative use within the meaning of K.S.A. 22-3102(b)(2). In this case, it appears that the State's theory—that Paico and the defendants murdered Clark to get money to feed their cocaine addictions—stemmed directly from the immunized inquisition testimony. It does not matter that some of the evidence to support that post-inquisition theory of prosecution was obtained before the immunized statements, where the full significance of the earlier evidence was not previously known.

With respect to the excluded lay witnesses, the district court carefully explained why the State had failed to meet its *Kastigar* burden for each. On appeal, the State places a favorable spin on the facts to urge us to find that it did not make a derivative use of the immunized statements with respect to those lay witnesses. We must decline the invitation to function as a factfinder. The district court's negative finding that the State failed to carry its burden of proof is entitled to the full measure of the deferential review standard applicable to that question. Moreover, at the *Kastigar* hearing, the district court made the following finding:

"It is very painfully apparent when you review the evidence in these two cases that there literally was no case available against these two defendants until such time as Ms. Paico signed and provided information following the reaching of her cooperation agreement with the State of Kansas. Reaching this agreement by Ms. Paico was also, obviously, motivated in part by the knowledge that was communicated by Mr. Goodman to her that the defendant Carapezza had implicated Ms. Paico. Ms. Paico's agreement was undoubtedly a result of knowledge of that implication."

That characterization is supported by substantial competent evidence in the record. The investigation can be visualized as an upside-down pyramid, resting on the initial questionable statements of Paico. On top of that was layered the inquisition testimony of Carapezza and Hughes. Those statements led to numerous interviews with other witnesses and the development of other leads. Capping the pyramid is Paico's changed, plea-bargained story and the jailhouse witnesses. The State demonstrated no effort to support the pyramid with any independent foundation that did not rest squarely upon the defendants' immunized statements. To the contrary, the evidence adduced at the *Kastigar* hearing demonstrates that the State used the immunized testimony from the inquisitions as the launching pad for its case against Carapezza and Hughes.

At first blush, one might view the heavy burden placed on the State at a *Kastigar* hearing to be an onerous obstacle to prosecuting alleged murderers. But, as the district court pointed out, the prosecutor possesses the sole discretion and authority to choose who to immunize, who to let plea-bargain, and who to prosecute to the

fullest. Here, the State used Carapezza and Hughes to gather evidence against Paico and then used Paico to implicate Carapezza and Hughes. Ironically, the State maneuvered itself into a position of agreeing not to pursue a murder prosecution against Paico, who was the only person against whom it had physical evidence, while pursuing a murder prosecution against the first persons to whom it had granted immunity. Having made the decision to grant immunity to Carapezza and Hughes, the State is constitutionally and statutorily required to honor that commitment.

In *Carapezza I* and *Hughes I*, this court charged the district court with the daunting task of conducting a *Kastigar* hearing to assess which, if any, evidence the State could prove was not derived from the defendants' immunized testimony. The court's Herculean effort resulted in a well-reasoned opinion that correctly assessed the evidence in accord with the principles we set forth in our remand opinions. In short, the district court should be affirmed.

Affirmed.

ROSEN, J., not participating.

NANCY E. PARRISH, District Judge, assigned.