NOT DESIGNATED FOR PUBLICATION

No. 122,400

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ELYSIA A. MARCUS,
*Appellee*,

v.

ERIC SWANSON, M.D.,
*Appellant*,

v.

ELYSIA A. MARCUS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; DAVID W. HAUBER, judge. Opinion filed August 19, 2022.
Affirmed.

*Frankie J. Forbes*, of Forbes Law Group, LLC, of Overland Park, *Quentin M. Templeton*, of the
same firm, *Russell J. Keller*, of the same firm, and *William J. Skepnek*, of The Skepnek Law Firm, PA, of
Lawrence, for appellant.

*Matthew V. Bartle*, of Bartle & Marcus LLC, of Kansas City, Missouri, for appellee.

Before HILL, P.J., ATCHESON and WARNER, JJ.

ATCHESON, J.: In this case, we must apply defamation law crafted 40 years ago to
a decidedly 21st century set of facts. A plastic surgeon asserted that a "review" a
disgruntled former patient posted on an internet site falsely impugned his professional
reputation. A jury sitting in Johnson County District Court agreed and entered a $15,000

1

verdict for the physician. The district court set aside the verdict because the physician, who continued to maintain a full schedule of patients, did not prove any actual harm to his reputation as a result of the post—a necessary component for a successful defamation claim under Kansas law. The physician has appealed the ruling. We agree with the district court's assessment of the law, the evidence, and the required outcome and, therefore, affirm the ruling and the final judgment entered for the ex-patient on the defamation claim.

The jury also found the ex-patient violated a settlement agreement with the physician by posting the negative review and returned a verdict awarding him $2,500 for breach of contract. In her cross-appeal, the ex-patient contends the verdict lacks a basis in the trial evidence. We disagree and affirm that verdict and final judgment for the physician.

FACTUAL AND PROCEDURAL HISTORY

Dr. Eric Swanson, M.D., has a practice in Johnson County principally devoted to cosmetic surgery, including laser treatments of the face to reduce or eliminate wrinkles and other blemishes. Dr. Swanson performed a laser "resurfacing" of Elysia A. Marcus' face in December 2016 with what Marcus considered poor results. David Marcus, Elysia's husband, is a lawyer and contacted another lawyer who handles medical negligence claims. That lawyer made a settlement demand on Dr. Swanson. For purposes of this appeal, we may condense that aspect of the historical facts. In exchange for Dr. Swanson refunding the $2,500 fee for the laser treatment, the Marcuses gave up any legal claims they might have had against him and his clinic related to the laser treatment. The release the Marcuses signed in July 2017 also provided they "will not discuss this case or settlement in the media." The Marcuses never filed a medical malpractice action against Dr. Swanson.

2

Dr. Swanson and his clinic appear on various internet sites, including Yelp, and he and his staff periodically look at posts on those sites. In March 2018, Dr. Swanson discovered an exceptionally negative Yelp review from a "Lisa M." posted in November 2017. We may again boil down the historical facts for this appeal. Elysia Marcus wrote and posted the review. No purpose would be served in setting out the lengthy review. Rather, we can and do assume the content includes false statements that disparage Dr. Swanson in his profession and portray him as an incompetent who "ruins lives." The post urges potential patients to look into Dr. Swanson's past and to consider going elsewhere for cosmetic surgery. In 1999, Dr. Swanson stipulated in a proceeding before the Kansas Board of Healing Arts that he negligently treated three patients; he was publicly censured, and the Board required his practice be limited and monitored for about two-and-a-half years.

In May 2018, Dr. Swanson had a lawyer send a letter to the Marcuses demanding they take steps to remove the Yelp post, provide a written apology, pay $25,000 in damages, and sign a new release. The letter stated Dr. Swanson would sue the Marcuses if a settlement could not be reached. David Marcus promptly responded with an email threatening to file counterclaims in any civil action that would be damaging to Dr. Swanson's reputation and touting his own success as a litigator in the Kansas City metropolitan area. Four days later, David Marcus filed this action on behalf of Elysia for a declaratory judgment that the Yelp post did not violate the release they signed. Dr. Swanson duly answered, counterclaimed against Elysia Marcus for defamation and breach of contract—the claims eventually submitted for the jury's consideration—and named David Marcus as a third-party defendant in those claims.

The parties undertook discovery and filed various pretrial motions. The district court dismissed David Marcus as a party before trial. The jury heard the case over three days in August 2019. David Marcus' law partner represented Elysia Marcus during and after the trial. As we have said, the jury found Elysia Marcus breached the release and

awarded Dr. Swanson $2,500 in damages on that claim. The jury found the post to be defamatory and injurious to Dr. Swanson's reputation and awarded him $15,000 in damages. The jury also found Elysia Marcus acted willfully or maliciously—defined in the district court's instructions as acting "intentionally or purposefully" to do "wrong or caus[e] injury" or "do[ing] harm without any reasonable justification or excuse"—thereby exposing her to an award of punitive damages to be set by the district court. See K.S.A. 60-3702.

After the district court received the jury's verdicts, Elysia Marcus renewed the motions for judgment as of a matter of law she had made during the trial on the grounds Dr. Swanson had not proved any actual damage to his reputation from the Yelp post. The district court granted the renewed motion, set aside the jury verdict on Dr. Swanson's defamation claim, and entered judgment for Elysia Marcus. Elysia Marcus neither specifically disputed the verdict on the breach of contract claim nor augmented the grounds she had raised for judgment in her favor during the trial. The district court understood she was not contesting the breach of contract verdict and entered judgment for Dr. Swanson.

Dr. Swanson appealed the district court's decision on the defamation claim. Elysia Marcus then cross-appealed the judgment against her on the breach of contract claim. We first take up Dr. Swanson's appeal and then address Elysia Marcus' cross-appeal. We supplement our introductory account of the factual foundation for this litigation and its procedural progression as necessary.

4

LEGAL ANALYSIS

I. DR. SWANSON'S APPEAL

A. *Standard of Review*

In considering a motion for a judgment as a matter of law, the district court must view the trial evidence in the best light for the party opposing the motion and give that party the benefit of any reasonable inferences drawn from the evidence. If the evidence taken that way would properly support a jury verdict for the nonmoving party, the district court should deny the motion. *Russell v. May*, 306 Kan. 1058, Syl. ¶ 2, 400 P.3d 647 (2017); *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015). The motion presents a question of law, and the ruling entails no weighing of disputed evidence. Accordingly, on appeal, we apply the same standard and owe no deference to the district court's decision. *Russell*, 306 Kan. 1058, Syl. ¶ 2.

B. *Legal Principles Governing Defamation*

Defamation is a species of tort based on one person or entity's publication of false statements that diminish the reputation of another person. *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 5-6, 649 P.2d 1239 (1982). The utterance of an oral defamation is slander, and the dissemination of a written defamation is libel. Here, we are concerned with libel. The redressable harm entails the diminution of the subject's positive standing or esteem within a community, be it a professional network, an extended social circle, or some segment of the public at large. *Moran v. State*, 267 Kan. 583, 589-90, 985 P.2d 127 (1999); *Gobin*, 232 Kan. at 6. Conversely, the subject's own emotional distress or upset caused by the publication will not alone support a claim for defamation, although damages for those noneconomic injuries may be recovered as an adjunct to a proved loss of reputation. 232 Kan. at 7.

5

Historically, defamation law recognized certain kinds of false statements were so noxious that damages were presumed to flow from their publication. The subject did not have to independently demonstrate a loss of community standing. Pertinent here, this kind of defamation—known as libel per se or slander per se—included false statements disparaging a person's abilities in his or her occupation. See *Gomez v. Hug*, 7 Kan. App. 2d 603, 611-12, 645 P.2d 916 (1982) (libel per se includes "'imputation of a person's unfitness for his trade or profession'") (quoting *Kraisinger v. Liggett*, 3 Kan. App. 2d 235, 237, 592 P.2d 477 [1979]). But the Kansas Supreme Court abolished libel per se and slander per se in *Gobin*, 232 Kan. at 5, and has since reiterated that position in *Moran*, 267 Kan. at 599. We return to that development in the law shortly, since it bears on Dr. Swanson's claim, given the content of the Yelp post.

As with many torts, the legal principles governing defamation are largely the product of the common law—judicial rules established through case precedent—rather than of statutes or legislative prescription. So the reach of the tort and what an ostensibly defamed plaintiff had to prove to prevail expanded and contracted as appellate courts crafted the law through their opinions. As a result, defamation law historically was the province of state courts and tended to be shaped and fine-tuned in each jurisdiction. But the insular character of defamation law changed dramatically in the middle of the 20th century when the United States Supreme Court recognized a constitutional overlay to that law grounded in protections for robust debate of matters of public concern undergirding the free speech and free press clauses of the First Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment. The Court's decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-71, 279-80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), was the fountainhead for that legal reordering.

Central to *New York Times*, the Court recognized that the First Amendment requires "public official[s]" bringing libel actions to prove a publisher of a "defamatory falsehood" about their "official conduct" did so with "'actual malice'—that is, with

6

knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80. The Court, however, did not attempt to mark the outer reaches of its casting of the First Amendment—a doctrinal shift often described as revolutionizing defamation law. See Kohler, *Forty Years After* New York Times v. Sullivan*: The Good, The Bad, and The Ugly*, 83 Or. L. Rev. 1203, 1203-04 (2004); Stone, *Justice Brennan and the Freedom of Speech: A First Amendment Odyssey*, 139 U. Pa. L. Rev. 1333, 1343-44 (1991); Abrams, *A Worthy Tradition: The Scholar and The First Amendment*, 103 Harv. L. Rev. 1162, 1166 (1990). In a series of decisions, the Court further crafted and refined the constitutional shields available to defendants in defamation actions. For example, a Court majority extended the *New York Times* requirement of proof of actual malice to defamation actions brought by "public figures," a somewhat ill-defined class of persons commanding public interest or attention because of their prominent positions or their noteworthy conduct. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 163-65, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967) (Warren, C.J., concurring, joined in pertinent part by Black, Douglas, Brennan, and White, JJ.). A plaintiff likewise must prove *New York Times* actual malice by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 202 (1986); *Nunes v. Lizza*, 12 F.4th 890, 895 (8th Cir. 2021); *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020).

Among those decisions, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), significantly changed Kansas defamation law and continues to fix its boundaries. See *Moran*, 267 Kan. at 599; *Gobin*, 232 Kan. at 4-5; *Rockhill Pain Specialists v. Hancock*, 55 Kan. App. 161, 185-86, 412 P.3d 1008 (2017). Gertz, a lawyer, sued a magazine for libel for publishing an article in 1969 branding him a communist or a communist sympathizer. The Court considered Gertz to be a private person rather than a public figure and held such plaintiffs could not recover presumed damages or punitive damages unless they proved actual malice as defined in *New York Times*—consistent with the constitutional protections of the First Amendment. But a state

7

could permit private-party plaintiffs to recover damages for actual harm to their reputations if a defendant publisher were merely negligent. *Gertz*, 418 U.S. at 347-50.

As we have indicated, the Kansas Supreme Court has fashioned a rule in light of *Gertz* that requires any plaintiff to prove actual damages flowing from the defendant's defamatory statements. The *Gobin* court enunciated two key principles drawn from *Gertz*: (1) "Damages recoverable for defamation may no longer be presumed; they must be established by proof, no matter what the character of the libel." and (2) "Unless injury to reputation is shown, plaintiff has not established a valid claim for defamation, by either libel or slander, under our law." 232 Kan. at 5-6. They remain cornerstones of Kansas defamation law.

The United States Supreme Court again looked at balancing constitutional free speech protections and the common-law right of private parties to recover for damage to their reputations in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985). In that case, Greenmoss Builders sued Dun & Bradstreet for disseminating a credit report to five subscribers that falsely stated the company had filed for bankruptcy and misrepresented its assets and liabilities. Five justices agreed Greenmoss was not constitutionally required to prove actual malice to recover presumed damages or punitive damages in its defamation action. Three justices distinguished *Gertz* because the defamatory publication in that case involved an issue of "public concern" and Greenmoss' claim rested on a purely private matter. 472 U.S. at 763. Chief Justice Burger concurred in the judgment and noted his dissent in *Gertz* and his continuing view that *Gertz* was wrongly decided. 472 U.S. at 763-64 (Burger, C.J., concurring). In a more extended concurring opinion, Justice White also joined in the judgment, reiterated his dissenting views in *Gertz*, and questioned generally the wisdom of the Court's expansion of the rule in *New York Times*. 472 U.S. at 771-72, 774 (White, J., concurring). In *Dun & Bradstreet*, then, five justices recognized that the First Amendment neither precludes recovery of presumed damages or punitive damages nor

requires proof of actual malice when a private person sues for defamation arising from the dissemination of a statement unrelated to a matter of public concern.

The upshot seems to be that the categorical abandonment of libel per se outlined in *Gobin* and since repeated in *Moran* is not constitutionally mandated under the First Amendment or *Gertz*. See *W.J.A. v. D.A.*, 210 N.J. 229, 246, 43 A.2d 1148 (2012) (recognizing *Gobin* "abolished" presumed damages and required "proof of actual injury to reputation in all cases"). But doing so is presumably constitutionally permissible in that a state may afford greater protections—but not lesser protections—than the federal Constitution commands. See *Gertz*, 418 U.S. at 347 (consistent with constitutional requirements, "the States may define for themselves the appropriate standard of liability" in defamation actions); see also *State v. Carapezza*, 293 Kan. 1071, 1077, 272 P.3d 10 (2012) (State may provide greater rights or protections than federal Constitution guarantees). So a state, by common-law rule or statutory directive, may afford defendants greater protections in defamation actions than the First Amendment requires. See *Bierman v. Weier*, 826 N.W.2d 436, 449 (Iowa 2013) ("Iowa can make its defamation law more protective of defendants than the First Amendment requires."); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 117 (Tex. 2000) ("While we have occasionally extended protections to defamation defendants greater than those offered by the United States Constitution, we have based these protections on the common law, not the Texas Constitution."). A state constitution may also establish rights beyond those found in the United States Constitution. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, Syl. ¶ 3, 440 P.3d 461 (2019). Here, the parties have not mentioned, let alone engaged, the free speech protections in the Kansas Constitution Bill of Rights section 11.

With that brief overview of defamation law, we turn to Dr. Swanson's argument that the district court improperly entered a judgment as a matter of law in favor of Elysia Marcus, voiding the jury verdict for him.

C. *The Parties Frame the Issue on Appeal*

The parties have treated this case as one alleging purely private defamation—portraying a private person claiming to have been besmirched by statements unconnected to any matter of public concern. It is less than clear whether the issue has been framed that way deliberately or inadvertently. The premises are at least debatable.

Courts have held that persons heavily advertising on the internet and otherwise injecting their business interests into the public eye or professional circles may be limited purpose public figures required to prove actual malice in suing for defamation related to those endeavors. See *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 24-25, 53 Cal. Rptr. 3d 752 (2007); *Hibdon v. Grabowski*, 195 S.W.3d 48, 59-60 (Tenn. App. 2005) (business owner touting on the internet and elsewhere his innovative modifications enhancing performance of jet skis deemed limited purpose public figure). In *Gilbert*, an often-cited case, the court held a plastic surgeon specializing in cosmetic procedures to be a limited purpose public figure in his defamation action against a dissatisfied patient who used a website to express her dissatisfaction. The court relied on the surgeon's advertising, appearances in the media, and authorship of articles promoting the benefits of such surgery. 147 Cal. App. 4th at 24-25.

Courts have also held that public comments about a medical doctor's competence may sufficiently touch on matters of public concern to require proof of actual malice in a defamation action based on those comments. See *Alost v. Lawler*, 326 So. 3d 1255, 1264 (La. App. 2021) (guest article written by son of patient attacking quality of care physician provided his parent addressed matter of public concern); *Teachers Federal Credit Union v. Esquivel*, 621 S.W.3d 786, 797-98 (Tex. App. 2021) (discussing Texas cases recognizing quality of healthcare provider's services to patient matter of public concern under defamation law); cf. *Gilbert*, 147 Cal. App. 4th at 23-24 (widespread discussion of

10

risks and benefits of elective cosmetic surgery rendered the topic a matter of public interest and concern).

Dr. Swanson and Elysia Marcus have effectively avoided those issues through their joint silence on them. And the district court quite properly didn't venture into those aspects of defamation law uninvited. The parties' briefing to us is similarly circumspect. We, too, have no occasion to consider what has not been presented to us in this civil action. See *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1006-07, 425 P.3d 1253 (2018) (appellate court typically will not consider issue parties have not raised). The issue for our review is the propriety of the district court's posttrial ruling setting aside the jury verdict for Dr. Swanson on his defamation claim. We take the issue in the frame the parties have given us—as one involving private parties and a matter of no public concern.

D. *Did Dr. Swanson Present Sufficient Evidence of Damage to His Reputation?*

Dr. Swanson contends he submitted evidence of actual damage to his reputation flowing from Elysia Marcus' post on Yelp. Although damages need not be proved with exactitude or certainty, they must be more than merely speculative. *Ryan v. Kansas Power & Light Co.*, 249 Kan. 1, 9, 815 P.2d 528 (1991); *Ohlmeier v. Jones*, 51 Kan. App. 2d 1014, 1021, 360 P.3d 447 (2015). In establishing reputational harm in a defamation action, a plaintiff need not prove a direct economic loss. But the evidence must provide a tangible basis for inferring a real (rather than merely a presumed) diminution in reputation.

For example, in *Moran*, a physician, who had specialized in heart transplant surgery, submitted an affidavit aimed at proving reputational harm in opposition to defendants' motion for summary judgment in his defamation action. In the affidavit, the physician represented that following the publication of negative statements from several colleagues in a newspaper article, he no longer received inquiries about his interest in

11

heading or starting up transplant programs at other hospitals and was no longer invited to write scholarly articles or to peer-review such articles for medical journals and other professional publications. The physician had left the transplant team and worked as a pediatric heart surgeon at a hospital in another state. Although characterizing that evidence as "weak," the court found it was legally sufficient to allow a jury to find the sort of actual reputational harm necessary to support a defamation claim. The court reversed the district court's summary judgment for the defendants. *Moran*, 267 Kan. at 593.

Here, Dr. Swanson personally testified it stood to reason that some potential patients read Elysia Marcus' post and looked elsewhere for a plastic surgeon. But he offered no evidence supporting his surmise. No deterred would-be patients testified. And no one claiming expertise in measuring the impact of the internet on consumer choice or the marketing and selection of physicians or other professionals testified. We suppose evidence from people who went to another plastic surgeon might have been difficult to assemble. We venture no comment on the universe of expert witnesses. Dr. Swanson identified an ostensible expert who purported to calculate a number representing deterred patients and a concomitant loss of revenue. The district court granted Elysia Marcus' pretrial motion to exclude the testimony as too speculative—a ruling Dr. Swanson has not appealed. See K.S.A. 2021 Supp. 60-456(b) (requirement for admissible expert testimony). But Dr. Swanson also testified that he was working at capacity both before and after the post, so he had as many patients as he could handle and suffered no loss of business.

Consistent with *Moran*, we infer a physician or other professional could go forward with a libel claim by showing a measurable drop in new patients or business following the prominent publication of defamatory statements. That would be circumstantial evidence tending to suggest reputational harm, and it would establish a quantifiable economic loss bearing on damages, especially in the absence of some other

12

obvious explanation. But see *Kuxhausen v. Tillman Partners*, 291 Kan. 314, 320-21, 241 P.3d 75 (2010) (*post hoc ergo propter hoc* reasoning alone indicative of speculation and does not forge causal link between purported wrongful conduct and claimed harm). We need not travel further down this path, since Dr. Swanson did not assert a decline in actual patients or in revenue.

Dr. Swanson testified that he continued to be an in-demand speaker at professional programs and did not suggest he otherwise lost professional engagements or opportunities because of the Yelp post. Again, consistent with *Moran*, that evidence at the very least cuts against some reputational harm. Dr. Swanson testified Elysia Marcus' statements in the post bothered him personally. But, as we have outlined, plaintiffs asserting defamation claims cannot rely on their own emotional upset or distress to establish the required reputational harm. Finally, Dr. Swanson testified he and his staff spent "hundreds of hours" to "deal with this," meaning the Yelp post and the ensuing litigation. He described his efforts to get the post taken down. And he briefly alluded to the attorney fees and other legal expenses he had paid. But those considerations do not translate into an actionable harm to Dr. Swanson's reputation. Likewise, the attorney fees would not be a recoverable damage even if Dr. Swanson otherwise proved his defamation claim. See *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 279, 241 P.3d 15 (2010) ("The 'American Rule' is well established in Kansas so that, in the absence of statutory or contractual authorization, each party to the litigation is responsible for his or her own attorney fees."); *Karrigan v. Valentine*, 184 Kan. 783, 788, 339 P.2d 52 (1959) (noting "in passing" attorney fees are not recoverable in action for libel).

Dr. Swanson also called a former patient of his as a witness at trial to testify she was concerned when she saw Elysia Marcus' Yelp post because it was in her view grossly inaccurate. She posted her own positive review of Dr. Swanson and later referred at least one person to him. The testimony, however, does not support damage to Dr. Swanson's

reputation. The evidence really is more or less to the contrary; the patient remained a supporter of Dr. Swanson and his work notwithstanding the post.

We share the district court's view that this array of evidence failed to show Dr. Swanson's reputation was actually diminished in some way as a result of Elysia Marcus' post on Yelp. Or, more precisely, that the evidence would permit reasonable jurors to conclude his reputation had been harmed. Dr. Swanson speculated the post—given its vituperation and inaccuracies—must have scared off potential patients. But that was no more than a guess, and guesses are not evidence. The other points Dr. Swanson testified to are neither direct nor circumstantial evidence of reputational harm. For purposes of this appeal, we do not question the legitimacy of his assertion he found the attack on his professional capability both unwarranted and distressing. But those circumstances do not legally support a defamation claim. Nor did the testimony of the former patient.

In closing argument to the jury, Dr. Swanson's lawyer did not identify specific reputational injuries flowing from Marcus' post and explicitly did not suggest a dollar amount the jurors should consider as compensatory damages. The lawyer explained to the jurors he struggled to come up with an amount and told them to "figure out a number that you think is fair compensation." The district court mentioned the closing argument in explaining its decision to set aside the jury verdict. On appeal, Dr. Swanson contends the district court improperly treated the argument as something like a binding admission the evidence showed no reputational harm. We don't read the district court's ruling that way. Rather, the argument is illustrative of the lack of evidence of actual reputational harm required to meet the standard set in *Gobin*. So the argument tends to confirm the evidentiary gap but does not in any legal way establish it.

The jurors' communications with the district court after they had begun deliberations suggest they felt the constraint of the law in weighing the evidence as they worked toward a verdict. The jurors asked if they could require Elysia Marcus to take

14

down her post as a remedy—effectively granting Dr. Swanson a mandatory injunction. They were correctly told they could not; juries may award money damages in a civil action, not equitable relief. See *Texas Const. Co. v. Hoisting and Portable Engineers' Local Union No. 101*, 180 Kan. 393, 395, 304 P.2d 498 (1956) (injunction action considered "purely equitable," so plaintiff not entitled to jury trial); *Jensen International, Inc. v. Kelley*, 29 Kan. App. 2d 836, 843-44, 32 P.3d 1205 (2001) (no right to jury trial in declaratory judgment action raising essentially equitable claims or issues). The jurors then asked if they could award litigation costs to Dr. Swanson and again were told they could not. After twice being rebuffed, the jurors returned a verdict awarding Dr. Swanson $15,000 in damages on the defamation claim—an amount that has no anchor in the evidence.

We hesitate to read too much into questions from deliberating juries; a given inquiry may be posed simply to satisfy a single vacillating or reluctant juror. The sequential inquiries here more readily depict jurors searching for an alternative path to the one laid out in the district court's instructions to give Dr. Swanson relief of some kind. The remedies the jurors wanted to award—requiring Elysia Marcus to remove the post or to pay Dr. Swanson's litigation expenses—were aimed at her morally blameworthy conduct in publishing a false statement rather than any actual loss of reputation to Dr. Swanson resulting from that conduct. Thwarted in those forays, they awarded what can fairly be characterized as a modest, if seemingly arbitrary, amount in compensatory damages, taking the only option available to them to redress what they considered Elysia Marcus' wrong.

The fundamental problem for Dr. Swanson rests in the requirement he offer evidence of *some* actual damage to his reputation to establish a legally submissible claim for defamation. Since *Gobin*, Kansas law no longer presumes reputational harm from a false statement denigrating a person's professional skill or competence. The absence of demonstrable harm, then, legally dooms a claim, even when the challenged statement is

15

indisputably scurrilous and its author has acted quite deliberately in publishing it. The essential flaw lay in Dr. Swanson's failure to establish facts showing an actual injury, rendering any compensatory amount insupportable. The jurors seem to have struggled with that reality. The district court, however, was obligated to give legal effect to it by granting Elysia Marcus' renewed motion for judgment as a matter of law following the verdict. See K.S.A. 2021 Supp. 60-250(b)(3).

On appeal, Dr. Swanson raises a pair of procedural arguments we quickly dispatch. First, he contends the district court engaged in a legally impermissible about-face by denying Elysia Marcus' motion for summary judgment and then granting her renewed motion to set aside the jury verdict. Dr. Swanson submits the evidence of reputational harm he offered in opposition to summary judgment was functionally the same as what he presented during the trial. Dr. Swanson cites no authority for the premise that a district court's denial of summary judgment imposes a legal constraint on or bar to granting a judgment as a matter of law during or following a jury trial. We are reasonably confident there isn't a developed body of the law to that effect.

Dr. Swanson's argument does not track with accepted civil procedure precepts. The statute governing motions for judgment as a matter of law does not contain a directive that a district court may not grant such a motion if it had denied a motion for summary judgment on the same grounds. See K.S.A. 2021 Supp. 60-250(a), (b). And the denial of summary judgment, as an interlocutory ruling, does not itself have any preclusive effect. See *Budd v. Walker*, 60 Kan. App. 2d 189, 197, 491 P.3d 1273 (2021). As a broad proposition, district courts should act "with caution" in granting summary judgment. See *Manley v. Hallbauer*, 308 Kan. 723, 726, 423 P.3d 480 (2018). Here, of course, it may be that the district court was too deferential to Dr. Swanson in considering summary judgment and, thus, too cautious in declining to rule against him then. We have not perused the summary judgment submissions and offer no studied opinion on the ruling. But a district court's circumspection in considering (and denying) summary

16

judgment does not impose a genuine legal obstacle to its ruling on a properly lodged motion for judgment as a matter of law.

Second, Dr. Swanson contends the district court's decision violated the protection for jury trials in the Kansas Constitution Bill of Rights section 5. The provision guarantees the right to jury trial "shall be inviolate" and has been construed to require jury trials in those cases in which they were permitted at common law when the Kansas Constitution was adopted. Kan. Const. Bill of Rights, § 5; see *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 442 P.3d 509 (2019). But Dr. Swanson frames the ostensible constitutional defect as arising from the district court's failure to apply the proper standard for assessing the evidence in ruling on Marcus' renewed motion for judgment as a matter of law. The argument, then, merely puts a constitutional veneer on the assertion the district court improperly weighed the evidence in granting the motion and setting aside the verdict. The argument rises or falls on that assertion and not on an independent ground under section 5. We have already explained why the district court properly granted the motion for a judgment as a matter of law, and that disposes of Dr. Swanson's ostensible constitutional claim.

E. *Does the Jury's Finding of Traditional Malice Make a Difference?*

Dr. Swanson contends the jury's factual finding that Elysia Marcus acted with traditional malice—that is, with an intention or design to do him harm—legally supports his defamation claim and, in turn, the verdict in his favor. But *Gobin* and the later iterations of defamation law in Kansas do not back up that theory. As we have explained, they require proof of actual reputational damage to make a submissible claim. And they do not (contrary to Dr. Swanson's suggestion) offer a substitute for that proof based on the publisher's malicious intent.

17

Basically, Dr. Swanson attempts to craft a rule that would permit a plaintiff to prevail on a defamation claim in some circumstances without showing actual harm. Under his approach, a plaintiff would have a judicial forum to prove the falsity of the challenged statements when the publisher acted with an evil purpose and could recover nominal actual damages and, perhaps, punitive damages. Such a formulation of defamation law would benefit Dr. Swanson in this case. More broadly, the rule would offer a path for name-clearing vindication in some cases and, in that way, would be similar to libel per se. Rather than relying on the message communicated, as does libel per se, Dr. Swanson's rule would turn on the publisher's pernicious intent in choosing to communicate a defamation whatever its content. Despite Dr. Swanson's characterization otherwise, he has asked us to change Kansas defamation law, albeit in an intriguing way. Because common-law doctrine defines the scope of permissible defamation claims, we cannot simply cast aside what the Kansas Supreme Court has declared the law to be. See *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 629-30, 349 P.3d 1283 (2015).

Dr. Swanson's point on appeal also implicitly suggests libel per se may serve a significant remedial purpose in defamation law, especially in the age of the internet. Anyone with a computer and access to the internet can reach an extraordinarily large audience with stunning immediacy and a degree of permanency that outstrips other means of publication. Those tools offer a soapbox and megaphone that reach millions— not just passersby on the town square or recipients of leaflets handed out in front of the state capitol or even readers of a full-page advertisement in the print edition of The New York Times such as the one that prompted the *Sullivan* case. That ability to communicate carries with it an extraordinary power to promote what may be frivolous or profound or good or malevolent.

In laboratory conditions, the marketplace of ideas is supposed to be self-regulating in the sense the intrinsically sound will drive out the unsound. But the marketplace doesn't necessarily function that way in the real world. Defamation law, in turn, provides

18

a tailored remedy to persons besmirched in public forums, especially when simply putting out a counter-narrative may be an ineffective antidote for particularly corrosive falsehoods. That is, the marketplace sometimes works too slowly or not at all, and some statements about some people are so obviously wrongful, such as false representations demeaning them in their chosen occupations, that their very publication arguably should permit vindication in a judicial forum. But the law should not be so onerous as to stifle vigorous and even controversial debate on matters of public concern. Balancing those competing and undeniably valuable objectives typically falls to the courts in fashioning defamation law.

As this case illustrates, the internet has radically altered how the forces that drive the marketplace of ideas operate. Given the epochal change, some courts have closely examined whether and how libel per se may provide a needed check on those forces in certain circumstances. They have chosen to retain libel per se, at least in cases involving private parties and private matters. See, e.g., *Bierman*, 826 N.W.2d at 454; *W.J.A. v. D.A.*, 210 N.J. 229, 233, 43 A.3d 1148 (2012). For interested readers, the *W.J.A.* case offers an illustrative example of the power of the internet to catapult defamatory commentary far beyond earlier means of publication.

Conversely, in an internet era case, the New Mexico Supreme Court abolished libel per se, finding the doctrine to be incompatible with "the very essence of the tort of defamation" in remedying "actual injury to reputation." *Smith v. Durden*, 276 P.3d 943, 943, 948-49 (N.M. 2012). The statements at issue in *Smith* were not published on the internet, and the court did not discuss any implications such publication might have for defamation law generally or the doctrine of presumed damages particularly. The court did cite *Gobin* as supporting authority. 276 P.3d at 950. Similarly, the Missouri Supreme Court did away with libel per se in *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 313 (Mo. 1993), and apparently has not again considered the issue in the last 30 years.

19

The communications revolution in this century invites a reexamination of the common-law principles governing defamation law shaped before the prevalence of social media and interactive websites that can reach around the globe. See *Herington v. City of Wichita*, 314 Kan. 447, 456-57, 500 P.3d 1168 (2021) (stare decisis is not inexorable command and may yield when changed circumstances render a rule demonstrably unsound). Reexamination, however, does not necessarily mean change. The ramifications are both multifaceted and interlocking, given the permutations of defamation law turning on the public or private status of the publisher and the publisher's target combined with the subject matter of the publication. We do not mean to offer some veiled suggestion Kansas defamation law should be revised and simply repeat our observations that things are quite different now than they were when *Gobin* was decided.

Regardless of those observations, we are bound to apply the common law as the Kansas Supreme Court has presently defined it. On that basis, we reject Dr. Swanson's argument that the jury's finding that Marcus acted maliciously in the traditional tort sense salvages the verdict in his favor without proof of any actual damage to his reputation.

F. *A Rejoinder to the Dissent*

Judge Warner dissents on this issue and submits Dr. Swanson offered evidence of harm to his reputation. But her discussion does no more than elaborate on Dr. Swanson's argument that it "stands to reason" Elysia Marcus' Yelp post must have diminished his professional reputation. The argument trades on speculation and assumption—not facts. The trial record and the dissent are bereft of colorable direct or circumstantial evidence supporting a diminution of reputation. The dissent, however, does backhandedly make a case for why presumed damages might reflect good policy in cases similar to this, allowing individuals falsely demeaned in their trade or profession to clear their names in district court proceedings without having to prove actual reputational harm. The dissent really rests on a call for restoring libel per se in at least some circumstances.

20

The dissent first underscores that Elysia Marcus acted with the intent to harm Dr. Swanson professionally and sought to do so with a post containing false and disparaging information placed on a prominent internet site. Slip op. at 27. All of that is undisputed on appeal. And it proves the elements of falsity and publication necessary for a libel action. Nonetheless, gross falsity and wide publication, which we may assume here, do not substitute for or diminish the required proof of actual damage to reputation as an independent element of a colorable libel claim under Kansas law.

Dr. Swanson offered neither direct nor circumstantial evidence of harm to his reputation flowing from the Yelp post. As we have already said, direct evidence would have entailed testimony from persons seeing the post and thinking less of Dr. Swanson as a result. Such evidence would be difficult to assemble, and Dr. Swanson didn't offer any such witnesses at trial. His patient who did testify doesn't suffice, contrary to the dissent's suggestion. The patient read the post and was alarmed because she thought it might cause other people to unfairly think less of Dr. Swanson as a plastic surgeon. So she wrote a counter-post and continued to refer potential patients to him. Her testimony establishes only that she was of the opinion Elysia Marcus' post might harm Dr. Swanson's reputation. That's not proof of an actual injury. As we have also said, the post plainly did not adversely affect Dr. Swanson's reputation in that patient's eyes.

For all the trial record shows, visitors to the Yelp page may have routinely dismissed the post as a hysterical rant unworthy of credence or the work of a gallivanting internet troll randomly lobbing fake bombshells for his or her misguided amusement. And those skeptical visitors likewise would have discounted Dr. Swanson's aggregate rating of 3.5 stars as unrealistically low as a result of the unfounded negative review. Ultimately, the notion that somebody somewhere must have been adversely disposed toward Dr. Swanson because of the post cannot pass for evidence of actual reputational harm. If that were the law in Kansas, widespread publication of a falsehood alone would be sufficient without evidence of any diminution of reputation.

Reputational harm—like pretty much anything else—may be proved with circumstantial evidence. The dissent misconstrues our discussion of the lack of circumstantial evidence to be a requirement for proof of economic loss attributable to a defamatory statement. We neither suggest nor apply such a rule. A loss of business (and the resulting economic harm) could be circumstantial proof of a reputational injury if the downturned came on the heels of the publication of a defamatory statement, particularly if the statement attacked the subject's professional abilities. Here, Dr. Swanson offered no evidence of the kind and apparently maintained a full practice notwithstanding Elysia Marcus' post.

We also pointed out that Kansas cases recognize other forms of circumstantial evidence, such as the physician who asserted he stopped receiving inquiries from recruiters inviting him to consider positions heading departments at major hospitals and was no longer asked to write or peer review articles for professional journals. Those lost career opportunities would suggest a loss of professional standing or reputation without necessarily entailing any direct economic harm. Here, again, Dr. Swanson offered no comparable evidence. To the contrary, he testified he remained an in-demand presenter at professional seminars and conferences. There would be other ways of circumstantially showing a loss of reputation, but they didn't figure in this case. For example, a physician being removed or voted out as an officer of a professional society likely would be indicative of diminished reputation or standing. Even a pattern of social snubs closely following publication of a defamatory statement might be enough.

Against that backdrop and lack of evidence, we pointed out the jury's award of $15,000 appeared to be pulled out of the air. The seemingly random amount simply illustrated the weakness of verdict precisely because Dr. Swanson marshalled no evidence of an actual injury to his reputation. As the dissent says, adequate compensation for proved reputational harm may be difficult to quantify in dollars and cents, and a jury's award should be given the utmost respect. Slip op. at 32. But an award rendered in the

22

absence of evidence on a necessary element of the asserted legal claim cannot stand. Dr. Swanson presented only guesses that the Yelp post must have harmed his reputation rather than direct or circumstantial evidence that it actually did so. Accordingly, we have done no more than our required duty in affirming the district court's ruling granting Elysia Marcus' motion for judgment as a matter of law. See K.S.A. 2021 Supp. 60-250(b)(3).

## II. Elysia Marcus' Cross-Appeal

On appeal, Elysia Marcus contends the amount the jury awarded Dr. Swanson as damages for his breach of contract claim has no support in the evidence and, therefore, must be set aside. As we have outlined, the jury entered a verdict of $2,500 in damages for breach of the settlement agreement. Elysia Marcus has not otherwise challenged the verdict and resulting judgment on appeal, so we confine ourselves to this issue.

Elysia Marcus points out Dr. Swanson paid her $2,500 in exchange for her (and her husband's) release of any potential claims arising from the cosmetic laser treatment he performed and an agreement not to discuss the matter in the media. The verdict corresponds exactly to that amount. Elysia Marcus, in turn, argues the verdict actually represents an award of restitution—returning the consideration paid—rather than an award compensating for damages caused by any breach. Since Dr. Swanson did not pursue a claim for rescission and restitution, Marcus submits the verdict lacks support in the evidence as a damage award. Although Marcus' premise that restitution legally differs from money damages as a remedy for a breach of contract is correct, it doesn't provide the foundation for the result she wants, as we explain.

Before turning to that explanation, we address and dispose of a procedural counter-argument Dr. Swanson has posed. He says Elysia Marcus has raised this point for the first time on appeal, and we should not consider it for that reason. The appellate

record indicates Elysia Marcus did not present this ground for setting aside the jury verdict to the district court. We typically do not consider arguments raised for the first time on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). Elysia Marcus responds that Kansas appellate courts *do* address claims of insufficient evidence that have not been presented in the district court. We have repeatedly so stated in criminal cases. See *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008) (recognizing rule in context of criminal appeal); *State v. Lamb*, 57 Kan. App. 2d 633, 637-38, 458 P.3d 266 (2020). But it is hardly self-evident that the rule transfers to civil actions. See *Wood v. Groh*, 269 Kan. 420, 433-34, 7 P.3d 1163 (2000) (declining to consider sufficiency argument). But see *Alford Ranches, LLC v. TGC Industries, Inc.*, No. 112,375, 2015 WL 9591354, at *8 (Kan. App. 2015) (unpublished opinion) (citing *Farmer*, panel considers sufficiency of evidence supporting verdict for plaintiff on negligence claim for first time on appeal). We assume without deciding that Elysia Marcus has properly presented her argument; we do so merely to advance the appeal. See *Louisburg Building & Development Co. v. Albright*, 45 Kan. App. 2d 618, 628-29, 252 P.3d 597 (2011) (questioning extent to which new claim may be considered on appeal in civil action).

If one party materially breaches a contract, the other party has a choice of remedies including rescission or money damages. Rescission effectively attempts to place the parties in the position they would have occupied had the contract never been made and, thus, typically would include the return of any consideration. See *Springer v. O'Brien*, 164 Kan. 461, 463, 190 P.2d 341 (1948); *Erdley v. Dixon*, 127 Kan. 142, 144, 272 P. 154 (1928); see also *Economy Swimming Pool Co. v. Freeling*, 236 Ark. 888, 891, 370 S.W.2d 438 (1963); *Unger v. Ganci*, 161 N.Y.S.3d 546, 549, 200 A.D.3d 1604 (2021); 77A C.J.S. Sales § 228 (rescission remedies for breach of contract). Conversely, parties may sue for money damages compensating them for what they would have received had other parties performed their obligations under the contract rather than breaching. See *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 789, 107 P.3d

1219 (2005); *Steel v. Eagle*, 207 Kan. 146, 151, 483 P.2d 1063 (1971). The two forms of remedy are inconsistent, and a party suing for breach can recover on one theory or the other and typically must specifically elect a theory. *Lehigh, Inc. v. Stevens*, 205 Kan. 103, 106-07, 468 P.2d 177 (1970); *Rosen v. Hartstein*, No. 108,479, 2014 WL 278717, at *8 (Kan. App. 2014) (unpublished opinion); *Gamesa Energy*, 655 Pa. at 372-73.

Here, from the outset, Dr. Swanson asserted a claim for damages resulting from Elysia Marcus' breach of the settlement agreement based on her Yelp post. The jurors were never instructed on rescission and restitution. We, therefore, have no reason to treat the verdict as one for rescission and restitution. The question remains, however, whether the evidence supports a verdict of $2,500 in damages.

Contract damages must be proved with some degree of specificity and may not rest on elongated extrapolation or outright speculation. *Stovall*, 278 Kan. at 789; *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 50, 519 P.2d 667 (1974). As we have said, Dr. Swanson testified that he and employees of his clinic spent time trying to mitigate the effects of Elysia Marcus' Yelp post. Obviously, those efforts would have been unnecessary if she refrained from posting. But Dr. Swanson did not quantify the time with any particularity and attached no dollar value or financial loss to the diverted time. Nor could Dr. Swanson identify any diminution in business and, thus, clinic revenues attributable to the post. None of that evidence sufficiently established recoverable breach of contract damages.

But the evidence does show that Dr. Swanson valued Elysia Marcus' performance of the settlement—her refraining from suing him and not publicizing the matter—at $2,500, since that's how much he paid to buy that measure of peace. We are unwilling to say the jury erred in concluding the amount, which was certainly well-defined and without speculation, represented a reasonable measure of money damages that would

make Dr. Swanson whole. In other words, the monetary recovery represents a dollar value that substitutes for Elysia Marcus' actual performance of her contractual duties.

We recognize the dollar amount of the damages matches the consideration Dr. Swanson paid for the performance, but we fail to see why that renders the verdict inherently unreasonable or outside the evidence, especially on this record. Consistent with PIK Civ. 4th 124.16, the jury was instructed that the verdict should "fairly and justly compensate" Dr. Swanson for the damages he "sustained as a direct result of the breach of contract." We have no reason to suspect, let alone conclude, the jury did something other than follow the instructions in arriving at the $2,500 figure. See *State v. Crawford*, 300 Kan. 740, 757, 334 P.3d 311 (2014); *Koser v. Atchison, Topeka, & Santa Fe Ry. Co.*, 261 Kan. 46, 58, 928 P.2d 85 (1996). The amount is neither patently too large nor too small and comes within some fair range that would give Dr. Swanson a monetary equivalent of his expectation interest or the benefit of the bargain had the Marcuses fully performed the settlement agreement. See *Louisburg Building & Development*, 45 Kan. App. 2d at 638 ("The basic goal in awarding contract damages is to put the nonbreaching party in the position the party would have been in had the breach never occurred, without allowing that party a windfall[,]" thereby protecting an expectation interest.); *Vanderpool v. Higgs*, 10 Kan. App. 2d 1, 3, 690 P.2d 391 (1984) (recognizing money damages as fulfilling aggrieved party's expectation interest in benefit of contractual bargain).

We find Elysia Marcus has failed to establish any error calling for reversal of the jury verdict on Dr. Swanson's breach of contract claim. The arguments raised on appeal do not require us to consider what, if any, contractual relationship continues to bind the Marcuses and Dr. Swanson based on the settlement agreement. Accordingly, we offer no opinion on that score.

26

We affirm the district court in all respects on the issues the parties have presented to us. The district court properly set aside the verdict for Dr. Swanson on his defamation claim and properly retained the verdict for him on his breach of contract claim.

Judgment affirmed.

\* \* \*

WARNER, J., concurring in part and dissenting in part: I join my colleagues' analysis of the second issue in this case concerning Elysia Marcus' cross-appeal of the breach-of-contract verdict. And I have no qualms with the majority's thorough exposition of Kansas law relating to defamation claims. I diverge from the majority opinion, however, because I believe there was sufficient evidence presented at the trial to allow the defamation claim against Marcus to go to the jury.

Marcus left a Yelp post, including a one-star rating and a lengthy narrative, on Dr. Swanson's practitioner page and the page for his medical practice. The post stated that Dr. Swanson was a "monster" who was unlicensed and unprincipled and who had committed medical malpractice. The jury found Marcus' post to be defamatory—the information in the post was false and exposed Dr. Swanson to public contempt or ridicule or deprived him of the benefits of public confidence and social acceptance. See *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 6, 649 P.2d 1239 (1982). The jury also found the post to be willful and malicious—Marcus intended to injure Dr. Swanson and did so without any reasonable justification or excuse. See *Turner v. Halliburton Co.,* 240 Kan. 1, 8, 722 P.2d 1106 (1986). Though Marcus cross-appealed, she has not challenged these findings. We thus accept them as true.

The only question that remains is whether there was evidence that Marcus' Yelp post injured Dr. Swanson's reputation. After being instructed on this element of a

27

defamation claim, the jury found Dr. Swanson had proven reputational injury and awarded him $15,000 in damages. The district court and the majority of this panel disagree with the jurors' assessment. But viewing the evidence in the light most favorable to Dr. Swanson, as our standard of review requires, I trust the jury's finding as one informed by the evidence, reasonable inferences, and common experience.

Dr. Swanson presented evidence at trial showing that Yelp is a review-aggregator platform. Yelp users leave reviews of businesses, along with a corresponding star-rating, with five stars being the highest rating and one star the lowest. The platform then highlights certain reviews as "recommended" commentary and deemphasizes other reviews that the platform does not recommend. Yelp also provides each business with a representative star-rating based on the users' submissions.

For whatever reason, Yelp highlighted Marcus' defamatory post as a "recommended" review. Neither Dr. Swanson nor Marcus provided any evidence about what criteria Yelp uses to determine whether a post will be recommended or not. But regardless of Yelp's internal criteria, Marcus testified that she posted her statement on Yelp because she wanted other people to see it. And after Yelp highlighted her review as recommended, Marcus refused to remove the post at Dr. Swanson's—and then his—lawyer's—request. A reasonable inference from this testimony is that Marcus created her post, and then insisted that it remain, because she wanted to influence other people's views about Dr. Swanson and his medical practice.

Dr. Swanson testified that he was concerned enough by the post that he and his staff went through significant—though unsuccessful—efforts to remove it. This included "hundreds" of hours of his and his staff's time.

One of Dr. Swanson's patients testified that when she saw the Yelp post, she felt "concerned that it might have a negative effect on his practice" and talked with the doctor

so "he knew it was out there." Dr. Swanson had treated this patient in 2011 (before the post), and she again sought treatment in 2018. She explained she "felt alarmed" when she read the post because she did not believe it matched her experiences with Dr. Swanson or correctly portrayed his quality of work. When Dr. Swanson told the patient he was trying to get the post removed, she responded, "Good, because that seems like it could be really damaging to your practice."

It is true, as the majority points out, that—despite Marcus' post—this patient sought and received treatment from Dr. Swanson a second time. But her testimony regarding reputational harm did not focus on *her* decision to receive treatment; it concerned the post's impact on Dr. Swanson's overall Yelp presence. According to the patient, the Yelp platform included 19 posts reviewing Dr. Swanson. Eighteen of those posts were positive, with Marcus' statement being the only negative comment. Yet 15 of the 19 posts were "not currently recommended" by Yelp and thus initially hidden from the main page. This meant that Marcus' post was given a degree of prominence that others were not. To "offset [the] negativity" of Marcus' post, the patient posted a positive review of Dr. Swanson on Yelp. For unknown reasons, Yelp did not denote this post as a "recommended" review, so it was hidden from the main page.

Dr. Swanson also provided evidence about the effect of Marcus' post on his Yelp star-rating. He testified that before Marcus' post, his star-rating—essentially a snapshot of his aggregate business ranking—was 5 stars. But after Marcus' 1-star post, his star-rating dropped to 3.5 stars. Dr. Swanson testified that without Marcus' post, he would have a 5-star rating.

Dr. Swanson testified that Yelp is an influential business-review platform, which is why he took steps to have the post taken down. His patient also testified about her reliance on review-aggregator platforms like Yelp in informing her decisions. She

29

testified that, given the popularity of Yelp generally and the prominence of Marcus' post specifically, the post was "harmful" to his reputation.

I find this evidence sufficient to demonstrate reputational injury. See *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011) (appellate court reviewing sufficiency of the evidence must draw all reasonable inferences in favor of verdict). Marcus created her Yelp post intending for people to see and be influenced by it. She refused to remove the post when it was highlighted by the Yelp platform because she knew *more* people would see her post and be influenced by it. Dr. Swanson's patient reached out to him because she was concerned about the post's negative impact. This combination of evidence, without more, may have danced on the razor's edge of speculation. But Marcus' post also affected Dr. Swanson's reputation in a real, measurable sense: *It reduced Dr. Swanson's Yelp star-rating from 5 to 3.5 stars.* Though people might reasonably disagree about *how* all this evidence should be interpreted, it is sufficient—in my view—to support the jury's finding that the post harmed Dr. Swanson's reputation.

My colleagues disagree with this conclusion. But instead of analyzing the evidence relating to Marcus' Yelp post and the inferences that arise from that evidence, the majority opinion focuses on what kind of evidence was *not* presented to the jury:

- The majority notes the absence of any expert testimony measuring the impact of the Yelp post or its effect on consumers. See slip op. at 12. But Yelp is "available to anyone with Internet access," and no one has argued that evaluating the effect of a defamatory post is a matter so outside the realm of consumer experience to require expert testimony. See *Hassell v. Bird*, 5 Cal. 5th 522, 527, 234 Cal. Rptr. 3d 867, 420 P.3d 776 (2018). Accord K.S.A. 2021 Supp. 60-456(b) (expert testimony is only admissible when it would assist the trier of fact to understand the evidence). Jurors do not check their common sense at the courthouse door. In

30

2022, we should trust jurors, based on the evidence presented and the instructions given, to know what review-aggregator platforms are and to evaluate which posts are defamatory and harmful and which posts are not.

- The majority observes that Dr. Swanson did not provide evidence of more traditional measures of reputational injury, such as a decline in business income, patient load, or invitations to professional events. See slip op. at 11-13. But analysis premised on this observation is rooted in faulty logic; though courts have found that those measures demonstrate reputational injury in some cases, these potential losses do not exhaust the universe of harms that may enable a defamation claim to succeed.

In either instance, Marcus could have—and did—point out the absence of such evidence to the jury. Yet the jury still found Dr. Swanson had shown his reputation was harmed.

Finally, the majority opinion notes the absence of evidence relating to the precise monetary impact of Marcus' post on Dr. Swanson's practice. But in doing so, the majority conflates reputational injury and economic loss. While Kansas law requires a person to show actual injury to prevail on a defamation claim, courts have never limited reputational injury to monetary losses—a reality the majority recognizes. See slip op. at 11, 14-15. In fact, Kansas law contemplates the opposite—that reputational injury can (and often does) include noneconomic harm. In *Moran v. State*, 267 Kan. 583, 599, 985 P.2d 127 (1999), which the majority discusses at length, the Kansas Supreme Court closed its decision by quoting the Supreme Court of the United States in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974):

> "'We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm

31

inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.'"

See also Comment to PIK Civ. 4th 127.54 (quoting *Gertz* and noting that "'actual injury is not limited to out-of-pocket loss'").

There is no question that noneconomic injuries can be difficult to quantify, regardless of the type of claim or issues raised. But courts routinely entrust juries with this task, whether it be in assessing pain and suffering in personal-injury cases, reputational injury in defamation suits, or other noneconomic injuries such as emotional distress. See, e.g., PIK Civ. 4th 171.02 (instructing juries on noneconomic loss). And Marcus does not dispute the suitability of the jury's $15,000 damage award—a factual assessment to which appellate courts show great deference. See *Jackson v. City of Kansas City*, 263 Kan. 143, 154-55, 947 P.2d 31 (1997). She argues that Dr. Swanson's defamation claim fails as a matter of law, asserting there is *no* evidence to support the jury's finding that Marcus' Yelp post injured Dr. Swanson's reputation.

As the majority notes, this case presents the somewhat daunting challenge of applying longstanding defamation principles to a situation not envisioned when those principles were adopted and developed. With the advent of internet-review websites and applications like Yelp, businesses have access to a more active and interactive market presence. At the same time, individual reviewers on those platforms can influence others in a way that would not have been possible a little more than a decade ago.

But the law is broad and adaptable. And just because the application of the law may lead to unconventional results under a particular set of facts doesn't mean it's not right, or that we should not entrust the case to the jury's evaluation and experience.

Because there was evidence to support the jury's finding that Marcus' Yelp post injured Dr. Swanson's reputation, I would reinstate the verdict on Dr. Swanson's defamation claim. Thus, I respectfully dissent.